# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RON MORRIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 24-cv-10811 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| BNSF RAILWAY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

For the third time, Ron Morris has sued his former employer, BNSF Railway Company, about their rocky railroad relationship. It all started in 2013, when Morris worked as a conductor and sped down the tracks in a train full of hazardous materials. Speeding with a trainload of toxic cargo didn't go over well with BNSF. They investigated, and then fired him.

Morris filed the first lawsuit in 2015, alleging race discrimination. The case was about the disciplinary process itself, not the fact that Morris had hurdled down the tracks too fast. The case went to trial, and he won. The district court awarded him hundreds of thousands of dollars in compensatory and punitive damages.

The damages included back pay and front pay. Instead of ordering reinstatement, the district court awarded Morris front pay, meaning compensation for future lost income. The district court recognized that the relationship between Morris and BNSF was broken beyond repair. BNSF didn't want to rehire him, especially given the safety violations. So Morris received $137,450 as compensation for the loss of future work.

Morris sued BNSF a second time in 2020, alleging race discrimination and fraudulent misconduct. Off the bat, the district court pressed Morris to explain how the second lawsuit was different than the first lawsuit. Before long, Morris dropped the case.

But Morris didn't ride off into the sunset, never to be heard from again. Instead, Morris brought the lawsuit at hand, his third case against BNSF about his dismissal. Morris alleges racial discrimination because BNSF is refusing to reinstate him. He also claims that BNSF is "blackballing" him by telling other railroad companies about why he left the company.

BNSF moved to dismiss on a few grounds, including res judicata. BNSF argues that Morris already covered this ground in his 2015 lawsuit, and cannot return to old territory.

For the following reasons, BNSF's motion to dismiss is granted. Morris has gone down this track before, and after arriving at a big payday, he has nowhere else to go.

## Background

At the motion-to-dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

The Court also may "take judicial notice of public court documents and proceedings when considering a Rule 12(b)(6) motion." *Fosnight v. Jones*, 41 F.4th 916, 922 (7th Cir. 2022) (collecting cases); *see also Collins v. Village of Palatine*, 875 F.3d 839, 842 (7th Cir. 2017) (noting that "judicial notice of public court documents is appropriate when ruling on a Rule 12(b)(6) motion to dismiss"). Judicial notice is proper for "facts readily ascertainable from the public court record and not subject to reasonable dispute." *See Ennenga v. Starns*, 677 F.3d 766, 774 (7th Cir. 2012).

A district court doesn't have to close its eyes and cover its ears when it comes to other cases in front of other judges. A district court can take into account what happened in prior cases, even at the motion-to-dismiss stage.

This case is the third lawsuit filed by Morris against BNSF about his termination. But the complaint in the current lawsuit doesn't say much about the two prior lawsuits.

The complaint at hand says that Morris got a job as a conductor with BNSF in 2004, and lost his job in 2013. *See* Cplt., at ¶ 13 (Dckt. No. 1). In 2015, he sued BNSF for racial discrimination under Title VII and 42 U.S.C. § 1981. *Id.* at ¶ 14. And in 2019, he won a jury verdict, and the Seventh Circuit affirmed in 2020. *Id.* at ¶ 15.

That's about it. The complaint doesn't tell the backstory, leaving it to BNSF to reveal the procedural history. This Court also had to do some digging to figure out what happened.

The backstory confirms that Morris's claim has run out of steam.

## I.     The First Lawsuit (the 2015 Lawsuit)

Again, Morris started working as a conductor at BNSF in 2004. *See Morris v. BNSF Ry. Co.*, 429 F. Supp. 3d 545, 552 (N.D. Ill. 2019) ("*Morris I*"). One day in 2013, Morris was driving a train carrying hazardous chemicals.

Morris broke the speed limit – twice. Once, he exceeded the speed limit by 10 miles per hour. The other time, he exceeded the speed limit by 12 miles per hour. *See Morris v. BNSF Ry. Co.*, 969 F.3d 753, 757 (7th Cir. 2020) ("*Morris II*").

2

Bad things can happen when cars speed. Really bad things can happen when trains speed. And really, really bad things can happen when trains speed with toxic chemicals.

BNSF's rules required Morris to self-report the violations, but Morris kept his need for speed to himself. *Id.* So, when the investigation started, Morris was sure to be disciplined. *Id.*

BNSF has both formal and informal investigation processes. *Id.* The specific details of each kind of process are not important here. The Seventh Circuit later explained the differences by analogizing them to discipline at school. The informal process is like getting disciplined by a teacher in the classroom, and the formal investigation process is like getting sent to the principal's office. *Id.*

Morris wanted an informal investigation. *Id.* But his request was denied by Scott Hendrickson, the Superintendent of Operations for BNSF's Chicago Division. *Id.*

BNSF opened a formal investigation. *Id.* Before long, Morris found himself in a formal investigation hearing before Division Trainmaster Brett Russell. *See Morris I*, 429 F. Supp. 3d at 552. Russell recommended suspending Morris for thirty days, followed by a review period of thirty-six months. *Id.*

Hendrickson forwarded the recommendation to the Review Board (BNSF's final decision maker on the formal investigation path). *See Morris II*, 969 F.3d at 758. Things didn't go smoothly for Morris.

Andrea Smith, BNSF's Director of Labor Relations and a member of the Review Board, recommended termination. *Id.* She noted that multiple speeding violations during one trip constituted a dismissible violation under BNSF's Policy for Employee Performance Accountability. *See Morris I*, 429 F. Supp. 3d at 552.

Morris was fired in April 2013. *Id.* He challenged his termination internally at BNSF, and then through union arbitration. *See Morris II*, 969 F.3d at 758. When both failed, he headed to court. *Id.*

Morris alleged wrongful discharge based on his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), and § 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981. *Id.* Both claims "have the same liability standards." *See Walker v. Abbott Lab'ys.*, 340 F.3d 471, 474 (7th Cir. 2003).

Morris didn't challenge the safety violations. That is, he didn't claim that BNSF discriminated against him when it found that he drove the train too fast. His violation of company rules wasn't disputed.

Instead, Morris proceeded on a theory of disparate discipline, meaning that BNSF treated him worse than non-black employees who committed similar rule violations. *See Morris II*, 969 F.3d at 758. "Disparate discipline is a theory of liability rooted, as its name conveys, in proving different treatment for discriminatory reasons – here, as Morris alleged, through the imposition

3

of more severe discipline when compared with the discipline non-black employees received for committing similar violations of BNSF's safety standards." *Id.*

Morris alleged that BNSF gave non-black employees an opportunity to resolve their problems through an informal investigation. *Id.* But BNSF denied him that same opportunity. *Id.* And, more importantly, Morris alleged that the non-black employees kept their jobs. *Id.*

Eventually, Morris went to trial on that theory of disparate discipline. Again, the issue was not whether Morris had violated company rules or committed a safety violation. He did. Instead, the issue was whether BNSF discriminated against him on the basis of his race when the company doled out his discipline.

Judge Kennelly presided at trial. After a four-day trial, the jury found in favor of Morris and awarded $375,000 in compensatory damages for pain, suffering, and loss of enjoyment of life. The jury also awarded $500,000 in punitive damages. *Id.* at 760. Judge Kennelly later reduced those amounts to $275,000 in compensatory damages and $370,000 in punitive damages. *Id.*

Judge Kennelly then conducted a bench trial on the issues of back pay, front pay, and reinstatement. *Id.* Judge Kennelly ultimately awarded substantial damages, totaling more than $650,000 in back pay and front pay (combined).

Specifically, the district court awarded $531,292 in back pay, finding that Morris did not fail to mitigate his damages. *Id.*

Judge Kennelly did not order reinstatement, so Morris didn't get his job back. Instead, the district court awarded $137,450 in front pay to compensate Morris for lost future income. *Id.* "The district court reasoned that the gravity of the safety infractions Morris committed would harm his ability to return to work without significant distrust and friction with his supervisors." *Id.*

When it was all said and done, Morris obtained a judgment for $1,313,742. BNSF appealed, and the Seventh Circuit affirmed. *See Morris v. BNSF Ry. Co.*, 969 F.3d 753, 757 (7th Cir. 2020) ("*Morris II*"). BNSF paid the judgment.

After the appeal, Morris submitted a letter in the district court, asking to send the case to arbitration. *See* 1/22/21 Letter (Dckt. No. 327), *Morris v. BNSF Ry. Co.*, No. 15-cv-2923 (N.D. Ill. 2019). The letter is hard to follow, but Morris took issue with Andrea Smith (again, BNSF's Director of Labor Relations and a member of the Review Board).

Judge Kennelly made quick work of that request. Judge Kennelly noted that Morris had already received relief, and there was no reason to reopen the case. *See* 1/26/21 Letter (Dckt. No. 329), *Morris v. BNSF Ry. Co.*, No. 15-cv-2923 (N.D. Ill. 2019).

## II.    The Second Lawsuit (the 2020 Lawsuit)

Peace didn't last long.  Morris sued BNSF a second time in October 2020.  *See* Cplt. (Dckt. No. 1), *Morris v. BNSF Ry. Co.*, No. 20-cv-6335 (N.D. Ill. 2020) ("*Morris III*").  Once again, Morris alleged acts of "fraudulent misconduct" and "racial discrimination."  *Id.* at 7.  For the second time, Morris complained about his termination, alleging that the company subjected him to "harsher discipline."  *Id.* at 5.

Judge Lee presided over the second case, and it didn't take long for Judge Lee to ask some pointed questions.  Judge Lee ordered Morris to "explain the nature of [*Morris I*] and why this case is different."  *See* 12/9/20 Order (Dckt. No. 8), *Morris III*.

In response, Morris explained that "[b]ased on the evidence presented in court [in *Morris I*,] Andrea N.[ ]Smith knowingly violated the rules, and guidelines of several BNSF corporate policies, by allowing, condoning, and exhibiting fraudulent conduct, and racial discrimination by either herself, or co workers [sic], when she acted to dismiss plaintiff."  *See* Correspondence, at ¶ 12 (Dckt. No. 9), *Morris III*.

The second case wasn't long for this world.  Before long, Morris voluntarily dismissed the case without prejudice.  *See* Mtn. to Dismiss (Dckt. No. 16), *Morris III*.

## III.    The Third Lawsuit (the 2024 Lawsuit)

Four years later, Morris reemerged.  He filed the case at hand against BNSF, once again alleging racial discrimination under Title VII and section 1981.  *See* Cplt., at ¶¶ 47–48 (Dckt. No. 1).

Morris basically complains about his inability to get a job with BNSF or with anyone else in the railroad industry.  He alleges that between 2013 (his termination) and 2023, he "applied for various railway positions, including several applications for re-employment with [BNSF], but was consistently rejected."  *Id.* at ¶ 17.

Morris struck out whenever he applied for a job.  Each time he interviewed, "despite being qualified, [Morris] was informed that the company would be 'considering other candidates.'"  *Id.* at ¶ 18.

Morris thinks that his difficulty with finding employment has to do with BNSF's "negative portrayal of his employment record to other railroad companies."  *Id.* at ¶¶ 21–22.  So, in February 2021, Morris asked Andrea Smith to change the reason for his termination from "dismissal" to "resignation," so that he could have better chances of reemployment with BNSF or other companies in the railway industry.  *See id.* at ¶ 19.  That request was denied.  *Id.* at ¶ 20.

In December 2022, Morris applied for two conductor positions with BNSF.  *Id.* at ¶ 24. Those applications were denied in January 2023.  *Id.* at ¶ 25.

In February 2023, Morris spoke about his rejected applications with Jeremy Brown, Vice President at BNSF. *Id.* at ¶ 26. Brown asked Morris, "who would want to hire someone with a settlement against you?" *Id.*

Morris applied for another position with BNSF in May 2023, and was rejected from that position in June 2023. *Id.* at ¶ 28. BNSF said that Morris was not rehired because Morris "left in bad standing." *Id.* at ¶ 29.

The complaint includes two related theories of racial discrimination. The first theory is that BNSF is refusing to rehire Morris because of his race. *Id.* at ¶¶ 46–47. The second theory is that BNSF has "blackballed" him from obtaining other employment in the industry "by tarnishing his reputation." *Id.* at ¶ 32.

BNSF moved to dismiss. *See* Mtn. to Dismiss (Dckt. No. 13).

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## Analysis

BNSF raises three affirmative defenses in its motion to dismiss: claim preclusion, issue preclusion, and the statute of limitations. This Court will address only claim preclusion, because that doctrine is enough to reach the end of the line.

Under the doctrine of claim preclusion, also called res judicata, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."[1] *See Barr v. Bd. of Trs. of W. Illinois Univ.*, 796 F.3d 837, 839 (7th Cir. 2015). "Res judicata blocks a second lawsuit if there is (1) an identity of the parties in the two suits; (2) a final judgment on the merits in the first; and (3) an identity of the causes of action." *Id.* at 840.

---

[1] Claim preclusion is an affirmative defense. *See U.S. Gypsum Co. v. Ind. Gas. Co.*, 350 F.3d 623, 626 (7th Cir. 2003). And complaints typically do not need to "anticipate or attempt to defuse potential defenses." *Id.* "But when an affirmative defense is disclosed in the complaint, it provides a proper basis for a Rule 12(b)(6) motion." *See Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir. 2008). In other words, "a plaintiff can plead himself out of court." *Id.*

There is no dispute about the first two elements. The first suit was between Morris and BNSF, just like the case at hand. *See Morris I*, 429 F. Supp. 3d at 551. That case ended in a final judgment on the merits, too. *See Morris II*, 969 F.3d at 768–69. So, the only issue is the third element, meaning whether the cases shared the same causes of action.

The Seventh Circuit has explained that "two claims are one for purposes of res judicata if they are based on the same, or nearly the same, factual allegations." *See Barr*, 796 F.3d at 840 (quoting *Hermann v. Cencom Cable Assocs.*, 999 F.2d 223, 226 (7th Cir. 1993)). And this Court is not "limited to the words in the complaint." *See Daza v. State*, 2 F.4th 681, 684 (7th Cir. 2021). Instead, this Court must "examin[e] the complaint to discern the basis of the litigation." *Id.*

Again, Morris raises two theories of racial discrimination in his current complaint. The first theory is that BNSF is refusing to rehire him because of racial discrimination. *See* Cplt., at ¶ 47 (Dckt. No. 1). The second theory is that BNSF is effectively "blackballing" him by not changing the reason for his termination from dismissal to resignation. *Id.* at ¶ 40.

The doctrine of res judicata stands in the way of each theory. Both claims involve the aftershocks of his termination, and Morris already litigated his termination.

## I.      Reinstatement

The first theory is about BNSF's refusal to rehire Morris. If that theory sounds familiar, you're paying attention. Morris already requested and received compensation for the fact that BNSF wouldn't rehire him. So he can't get a second helping of damages.

"[R]einstatement is the preferred remedy for victims of discrimination." *See Bruso v. United Airlines, Inc.*, 239 F.3d 848, 861 (7th Cir. 2001). But "a court is not required to reinstate a successful plaintiff where the result would be a working relationship fraught with hostility and friction." *Id.* For example, "reinstatement may become particularly infeasible if the plaintiff would no longer enjoy the confidence and respect of his superiors once reinstated." *Id.* at 862.

At the bench trial in Morris's first case, Judge Kennelly heard testimony from Morris's direct supervisor, Robert Della-Pietra. He offered plenty of reasons why Morris shouldn't get his job back.

Many of the reasons involved safety concerns, such as driving trains while sleeping.

For example, several engineers who rode with Morris told Della-Pietra that Morris would be asleep or inattentive while conducting the trains. *See* Bench Trial Tr., at 64 (Dckt. No. 307), *Morris v. BNSF Ry. Co.*, No. 15-cv-2923 (N.D. Ill. 2019). Morris was asleep for most of the train ride when he was speeding, according to an engineer who was with Morris at the time. *Id.* at 66–67.

Morris's coworkers also reported that they felt that Morris was unsafe, and that they did not want to see Morris on the property again. *Id.* at 85–86. Della-Pietra believed that he could not trust Morris to make safe decisions with a "sound mind" while driving trains. *Id.* at 82.

Della-Pietra opined that Morris's trial testimony showed a lack of knowledge about standard operating procedures and safety protocols. *Id.* at 70–71. But Morris apparently thought that he was untouchable. Engineers reported that Morris thought he was "bulletproof" (*i.e.*, could not be disciplined) because his aunt worked at BNSF. *Id.* at 65

Judge Kennelly considered that evidence and ultimately declined to reinstate Morris.

Judge Kennelly acknowledged that reinstatement was the preferred remedy. *Id.* at 123. But the district court found that Morris committed "a serious rule violation that did implicate safety." *Id.* at 124. And the district court reasoned that "[t]he railroad has to be concerned about not just the safety of its equipment but also the safety of co-workers and the safety of other people who might be impacted by the railroad's operations." *Id.*

Morris had put himself in a position where he "wouldn't enjoy the confidence and respect of the management at BNSF if he were reinstated." *Id.* Instead, "there would be a significant likelihood of undue friction and controversy." *Id.*

So, instead of reinstating him, Judge Kennelly awarded front pay and compensated Morris for the loss of future income. "The goal of front pay is to put the victim in the financial position he should have enjoyed, when circumstances make it inappropriate to direct the employer to promote (or hire) him." *See Biondo v. City of Chicago*, 382 F.3d 680, 691 (7th Cir. 2004).

The district court granted front pay of $137,450, which consisted of pay for "a little over two years." *See* Mem. Opin. & Order, at 2 (Dckt. No. 239), *Morris v. BNSF Ry. Co.*, 15-cv-2923 (N.D. Ill. 2019). Judge Kennelly reasoned that, given his work record, Morris "would not have remained employed by BNSF any longer than [two years]." *Id.*

In granting him the front pay, the district court opined that two years would give Morris "ample time . . . to secure comparable employment, even considering the deleterious effects of BNSF's discrimination." *Id.* at 2–3.

The damages award in the first case prevents Morris from seeking damages in the case at hand. Morris already requested and received damages for the fact that he would not work for BNSF in the future. So he can't seek compensation now for an inability to work for BNSF.

True, the time periods don't line up perfectly. Judge Kennelly awarded damages in 2019, and reasoned that Morris would not have worked for BNSF more than two years. Morris now seeks damages for an inability to get a job with BNSF in the intervening years. *See* Cplt., at ¶¶ 24, 28 (Dckt. No. 1). BNSF's refusal to rehire Morris in, say, 2023 hadn't happened yet.

Even so, Judge Kennelly was well aware of the possibility that Morris might live for more than two years. Judge Kennelly could have awarded Morris damages for the rest of his life, but he didn't. The district court awarded damages for only two years, and declined to award damages until the end of time. Given that reality, Morris can't seek damages now that Judge Kennelly declined to award.

Morris already requested and received compensation for the fact that the relationship with BNSF was broken beyond repair. The issue of reinstatement "falls within the scope of [his] first claim" of discriminatory termination. *See Daza*, 2 F.4th at 684. "An employer's refusal to undo a discriminatory decision is not a fresh act of discrimination." *See Lever v. Nw. Univ.*, 979 F.2d 552, 556 (7th Cir. 1992). And any requests for reinstatement here are "factually linked to [his] earlier suit," because he already asked for reinstatement in his first lawsuit. *See Barr*, 796 F.3d at 840.

At bottom, the first case compensated Morris for the broken relationship, including his inability to work for BNSF in the future. The fact that Morris already raised an argument about reinstatement in his first case, along with "the obvious connection between a complaint about being fired and a complaint that one was not re-instated to the same position, is enough to show that it was part of the earlier litigation." *See Daza*, 2 F.4th at 684.

The case at hand is Morris's "second stab" at raising his reinstatement claim, so "claim preclusion bars the present action." *Id.* at 685.

## II.     Blackballing

Morris also brings a claim about his inability to get a job with other companies in the railroad industry. He believes that the circumstances of his departure from BNSF make it difficult to find other work. And he believes that BNSF is blackballing him.

That theory has a familiar ring to it, too. The factual basis for the blackballing theory was part and parcel of the first lawsuit. Judge Kennelly considered the possibility that Morris might have a hard time getting another job based on the circumstances of his dismissal.

During the bench trial, Morris testified that he was unable to fully mitigate his damages from his termination. He acknowledged that he had found some lower-paying work. *See* Bench Trial Tr., at 3–5 (Dckt. No. 307), *Morris v. BNSF Ry. Co.*, 15-cv-2923 (N.D. Ill. 2019). But he wasn't able to get a job in the industry, even though he applied to over a dozen other railroad companies, plus other railroad-related companies. *Id.* at 12–16.

Morris testified that when he was interviewing with different railroad companies, several asked him about the "situation" with BNSF. *Id.* at 45–47. He struck out when looking for work, and he doesn't know why. *Id.*

The district court credited that testimony and reasoned that Morris did not fail to mitigate his damages. The district court noted that Morris "applied for multiple jobs with railroads and railroad-related businesses." *Id.* at 121. But when Morris got interviews, he would be "asked

about this incident [with BNSF], which you would expect, and ultimately [Morris] didn't get called back." *Id.*

The district court also reasoned that Morris's "prior track record with BNSF was a factor that inhibited him from getting other similar kinds of work, and that's not – honestly not terribly surprising." *Id.*

So, the district court granted Morris back pay of $531,292. *See Morris II*, 969 F.3d at 760; *see also* Mem. Opin. & Order, at 1 (Dckt. No. 239), *Morris v. BNSF Ry. Co.*, No. 15-cv-2923 (N.D. Ill. 2019).

The district court hypothetically could have awarded Morris front pay for his inability to find future work with other companies. But it didn't. Morris requested compensation for his inability to get other work. Judge Kennelly granted that request, but only awarded damages through the date of the judgment.

Morris already went to federal court and requested compensation for his inability to get another job. Judge Kennelly granted that request and awarded damages. After getting that pay-out, Morris cannot seek damages for the same thing a second time.

The new blackballing theory is new window-dressing on an old claim. At bottom, Morris complains about how BNSF handled the dismissal. Morris already litigated that issue.

For example, Morris alleges that BNSF is refusing to change the reason for his departure from "dismissal" to "resignation." *See* Cplt., at ¶¶ 19, 61. He takes issue with the fact that BNSF has refused to "clean up Plaintiff's employment record," and has continued to give a "negative portrayal of his employment history to other railway companies." *Id.* at ¶¶ 62, 63. He also believes that the circumstances of his departure "tarnish[ed] his reputation." *Id.* at ¶ 32.

Those allegations involve the ripple effects of his dismissal. Morris already litigated how BNSF handled his departure from the company. He obtained substantial relief based on how the company treated him. After litigating that issue, Morris cannot obtain more relief based on how BNSF handled his departure. Morris cannot challenge the circumstances of his dismissal twice.

The effects of Morris's termination from BNSF may still be ongoing today, but any claims arising from the underlying facts of his termination "fall[] within the scope of [his] first claim." *See Daza*, 2 F.4th at 684. Morris already had a chance to bring his blackballing theory in his first lawsuit. Indeed, he testified to that effect, and the district court credited his testimony in awarding him back pay.

Maybe the outcome would be different if Morris plausibly alleged that BNSF continued to discriminate or retaliate against Morris in new or different ways, separate and apart from his dismissal. But that's not the situation here. Morris continues to complain about the stain left by his dismissal. And Judge Kennelly already addressed that stain.

At bottom, his current blackballing theory and his earlier request for back pay in his first suit "arise out of the same main event." *See Barr*, 796 F.3d at 840. They're about his termination. So, "claim preclusion bars" his blackballing claim, too. *See Daza*, 2 F.4th at 685.

### Conclusion

For the foregoing reasons, Defendant BNSF's motion to dismiss is granted.

Date: September 23, 2025

_____

Steven C. Seeger
United States District Judge

11